215 P.3d 1121

**PREMIERE RV & MINI STORAGE LLC, Plaintiff/Appellee,**

v.

**MARICOPA COUNTY, a political subdivision of the State of Arizona, Defendant/Appellant.**

**No. 1 CA–TX 08–0009.**

Court of Appeals of Arizona, Division 1, Department T.

Sept. 15, 2009.

Nearhood Law Offices, PLC By James R. Nearhood, Scottsdale, Attorneys for Plaintiff/Appellee.

Andrew P. Thomas, Maricopa County Attorney By Louis F. Comus, III, Deputy County Attorney And Jean W. Rice, Deputy County Attorney, Phoenix, Co–Counsel for Defendant/Appellant.

Law Office of Jerry A. Fries By Jerry A. Fries, Phoenix, Co–Counsel for Defendant/Appellant.

## OPINION

SWANN, Judge.

¶ 1 When a parcel of real property is "split" into two or more parcels, the method by which property is valued for tax purposes is affected. The timing of the split can therefore have a significant effect on the amount of tax levied, and this case requires us to decide when a split occurs. We hold that when a portion of a parcel is sold, a split occurs, for tax purposes, when the Assessor completes the process of identifying and valuing the resulting parcels—not at the moment of the sale.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In 2003, there existed a 17–acre parcel, Maricopa County tax parcel number 501–46–003E (the "Parent Parcel"), that was comprised of a 16–acre mini-storage property and one acre of vacant land. On December 12, 2003, the owner of the Parent Parcel conveyed the one acre of vacant land to Desert West Holdings, Inc. ("Desert West"). On December 17, 2003, the owner of the Parent Parcel conveyed the 16–acre mini-storage property to KTP Holdings, LLC, DLP Holdings, LLC and MKP Holdings, LLC. On December 30, 2004, KTP, DLP and MKP conveyed the mini-storage property (the "Subject Property") to Premiere RV & Mini Storage ("Premiere").

¶ 3 In April 2004, the Assessor became aware of the 2003 sales of the two portions of the Parent Parcel. By that time, the Assessor had already valued the Parent Parcel for purposes of the 2005 tax year and had mailed the initial 2005 valuation notice to the original owner of the Parent Parcel pursuant to A.R.S. § 42–15101. The valuation date for the 2005 tax year was January 1, 2004.

¶ 4 There are two methods of valuation of real property under Arizona law. A.R.S. § 42–13301(A) ("Rule A") prescribes a methodology that prevents rapid rises in limited property value ("LPV") that might result from market increases, and generally applies when there have been no changes to the property that would affect its value. A.R.S. § 42–13302 ("Rule B") permits LPV to be determined by reference to the value of comparable properties. Rule B applies in a number of circumstances, including changes to the property by construction or destruction of improvements and "splits." In a rapidly appreciating real estate market, it is to the taxpayer's advantage to have a Rule B valuation applied as early as possible. In a declining market, delayed application of Rule B benefits the taxpayer, as the valuation then reflects more of the decrease in surrounding property values.

¶ 5 When a parcel is split, A.R.S. § 42–15105 permits the Assessor to amend the valuation and inform the owner of any change to the valuation on or before September 30 of the valuation year. Here, as in many cases, the Assessor was unable to complete his internal process to effect a change in the identification of the newly split parcels in the tax roll and value those parcels before September 30, 2004, the last day for notice of changed valuation for the 2004 valuation year.

¶ 6 In the 2003 valuation year, the Assessor had determined the 2004 tax year full cash value ("FCV") and LPV of the Parent Parcel were $2,870,100 and $2,298,698, respectively. A.R.S. § 42–13302(B) provides that when a split occurs after September 30

of the valuation year, the total LPV of the new parcels remains the same as the LPV of the original parcel, and the Assessor apportions that LPV among the new parcels. For the 2004 tax year, therefore, the Assessor apportioned the FCV and LPV of the Parent Parcel to the new parcels as follows:

| Parcel | 2004 FCV | 2004 LPV |
|---|---|---|
| One Acre lot | $ 47,534 | $ 38,071 |
| Subject Property | $2,822,566 | $2,260,627 |
| | $2,870,100 | $2,298,698 |

¶ 7 If he was correct in his contention that the split occurred after September 30, 2004, the Assessor was without the statutory authority to determine a new FCV in the 2004 valuation year. The Assessor, therefore, used the 2004 FCV that he had allocated to the Subject Property (which was based on the FCV of the Parent Parcel determined in the 2003 valuation year) to calculate the LPV for the 2005 tax year.

¶ 8 In 2005, the Assessor used Rule B to determine a new FCV and LPV for the Subject Property for tax year 2006. The application of Rule B in that year resulted in a substantial increase in valuation—the Subject Property was assessed a FCV of $5,680,442 and a LPV of $4,828,376.

¶ 9 On January 18, 2007, Premiere filed its complaint alleging that, because the split should be deemed to have occurred before September 30, 2004, the County should have used Rule B to value the Subject Property for the 2005 tax year, not the 2006 tax year.

¶ 10 The parties agreed that the trial court's resolution of the legal issue would obviate the need for trial, and filed cross-motions for summary judgment. On July 29, 2008, the tax court granted Premiere's motion for summary judgment and denied the County's cross-motion. The essence of the tax court's holding was that a split occurs when the owner of a parcel sells a portion of the parcel—not when the Assessor fixes new values to the newly created parcels. The County timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).

## STANDARD OF REVIEW

¶ 11 We review de novo the grant of a motion for summary judgment. *Tierra Ranchos Homeowners Ass'n v. Kitchukov,* 216 Ariz. 195, 199, ¶ 15, 165 P.3d 173, 177 (App.2007). Where, as here, there are no disputed facts, we independently review the trial court's application of law to those facts and are not bound by the trial court's legal conclusions. *Ariz. Joint Venture v. Ariz. Dep't of Revenue,* 205 Ariz. 50, 53, ¶ 14, 66 P.3d 771, 774 (App.2002). Interpretation of a statute is a question of law, and we owe no deference to a trial court's construction. *Turf Paradise, Inc. v. Maricopa County,* 179 Ariz. 337, 340, 878 P.2d 1375, 1378 (App. 1994).

## DISCUSSION

¶ 12 A.R.S. § 42–13302 (2006) provides:

A. In the following circumstances the limited property value shall be established at a level or percentage of full cash value that is comparable to that of other properties of the same or similar use or classification:

1. Land or improvements that were erroneously totally omitted from the property tax rolls in the preceding year.

2. Property for which a change in use has occurred since the preceding tax year.

3. Property that has been modified by construction, destruction or demolition since the preceding valuation year.

4. *Property that has been split, subdivided or consolidated between January 1 through September 30 of the valuation year.*

B. *In the case of property that is split or consolidated after September 30 through December 31 of the valuation year,* the total limited property value of the new parcel or parcels shall be the same as the total limited property value of the original parcel or parcels. *For the following valuation year, the limited property value shall be established at a level or percentage of full cash value that is comparable to that of other properties of the same or similar use or classification.* The new parcel or parcels shall retain the same value-adding characteristics that applied to the original parcel before being split or

consolidated, except as provided in subsection A, paragraph 3 of this section.

(Emphases added.) [1]

¶ 13 It is undisputed that a split occurred in this case as a consequence of the December 12, 2003 transaction. No Arizona statute, however, reveals *when* a split is deemed to occur for purposes of A.R.S. § 42–13302(A)(4) or whether formal action by the Assessor is required before a split occurs for tax purposes.

¶ 14 The fundamental goal of statutory construction is to give effect to legislative intent. *Bustos v. W.M. Grace Dev.*, 192 Ariz. 396, 398, 966 P.2d 1000, 1002 (App.1997). "We look first to the language of the statute on the presumption that the legislature says what it means." *Id.* (citing *Mail Boxes Etc., U.S.A. v. Industrial Comm'n of Ariz.*, 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995)). "If statutory language is clear and unambiguous, it is normally conclusive unless clear legislative intent to the contrary exists or impossible or absurd consequences would result." *Id.* "But when the language is ambiguous, we may also consider 'the context and subject matter, the effects and consequences of the statute, and other acts that are in pari materia.'" *Jones v. Weston*, 221 Ariz. 497, 212 P.3d 835 (App.2009) (quoting *Ban v. Quigley*, 168 Ariz. 196, 198, 812 P.2d 1014, 1016 (App. 1990)). "A statute is ambiguous 'if there is uncertainty about the meaning or interpretation of ... [its] terms,' or if 'the statute's text allows for more than one rational interpretation.'" *Stein v. Sonus U.S.A., Inc.*, 214 Ariz. 200, 201, ¶ 3, 150 P.3d 773, 774 (App.2007) (quoting *Hayes v. Continental Insurance Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994)).[2]

### 1. A.R.S. § 42–13302 Is Ambiguous As to the Effective Date of a Split.

¶ 15 Both parties reasonably contend that the plain language of A.R.S. § 42–13302

supports their respective interpretations. As Premiere argues, the language of the statute could demonstrate that the Legislature intended a change to the *property*, not a change to a tax parcel, to trigger a Rule B adjustment. Premiere focuses on the statute's express provisions requiring Rule B adjustments to LPV when the "property" has undergone a change in use, has been modified by construction, destruction or demolition, or has been split, subdivided or consolidated. A.R.S. § 42–13302(A)(2)–(4). Each clause in A.R.S. § 42–13302(A)(2)–(4), according to Premiere, describes a change that affects real property. The tax court, too, examined the broad range of Rule B triggers and concluded that the "inclusion of other owner-driven acts such as construction and demolition" indicated that property splitting is not an "assessorial act." Premiere argues with some force that the splitting of property, for the purpose of tax valuation, should be within the control of the owner (and should be consistent with public ownership records), rather than at the mercy of the Assessor's internal processes. Viewing Arizona's property tax statutes as a whole, however, we conclude that Premiere's position is inconsistent with the Legislature's intent.

¶ 16 The County argues that portions of the statute suggest that the term "split" refers to the administrative process conducted by the Assessor. A.R.S. § 42–13302(B) provides, in part, that when a split or consolidation occurs after September 30 through December 31 of the valuation year, "the total limited property value of the *new parcel or parcels* shall be the same as the total limited property value of the *original parcel or parcels*." (Emphasis added.) The County contends that because only the Assessor can create or deactivate parcels, the Legislature must have intended the acts of the Assessor to have significance. We agree.

---

1. We quote the language of the statute as it existed at the relevant time. In 2007, the statute was amended. Those amendments do not affect our analysis here, and would not have altered our decision had they been in effect at the relevant time.

2. Generally, ambiguities in tax statutes should be interpreted in favor of the taxpayer. *State ex rel. Ariz. Dep't of Revenue v. Phoenix Lodge No. 708, Loyal Order of Moose, Inc.*, 187 Ariz. 242, 247, 928 P.2d 666, 671 (App.1996). Because there is no interpretation here that consistently favors the taxpayer, *Phoenix Lodge No. 708* does not assist us here.

## 2. Property Ownership Does Not Alter the Tax Liability of the Property.

¶ 17 When we examine the statutory scheme governing property tax in Arizona, it becomes apparent that private transactions affecting land ownership are of only secondary importance to property taxation. From the standpoint of Arizona's property tax scheme, there is no inherent significance in a change in ownership.[3] Indeed, the owner of a parcel of land is not personally liable for payment of the taxes associated with the parcel. Rather, "[r]eal property taxes in Arizona are assessed against the property, not the owner." *Forum Dev., L.C. v. Ariz. Dep't of Revenue*, 192 Ariz. 90, 97, 961 P.2d 1038, 1045 (App.1997). *See also Santos v. Simon*, 60 Ariz. 426, 429, 138 P.2d 896, 897 (1943) ("The owner does not owe the tax levied against his property. The whole proceeding to collect taxes is in rem. Under our tax system, it is the property that is taxed, and not the owner.").[4] Because the tax is the liability of the land and not the owner, we see no reason in the absence of express statutory language to infer that the Legislature intended a change in ownership to create a change in tax treatment.

¶ 18 In *Tucson Mechanical Contracting, Inc. v. Arizona Department of Revenue*, 175 Ariz. 176, 178, 854 P.2d 1162, 1164 (App. 1992), we compared the origins of property taxes and transaction privilege taxes. We noted that "[u]nlike liability for property taxes, *which arises from the affirmative act of the state or county government*, liability for transaction privilege taxes arises automatically when a taxpayer engages in taxable business activity in Arizona." *Id.* (emphasis added). Property taxes, therefore, become an inherent liability of the land only when the government takes action to value the land and levy the tax.

¶ 19 Moreover, the Legislature has specifically referenced the Assessor's map in A.R.S. § 42–15105, linking the valuation conducted by the Assessor with additions to the map that occur as a result of "splits ... of assessment parcels." Harmonizing A.R.S. § 42–13302 with § 42–15105, we infer that the Legislature intended the term "property split" as it is used in the latter statute to mean the split of the assessment parcel as set out in the former statute.

## 3. The Statute Contemplates Several Rule B Triggers That Are Not Necessarily Tied to Changes of Ownership.

¶ 20 Premiere relies heavily on the notion that the events triggering Rule B valuation are owner-initiated, and contends that the Legislature must have intended that splits also be determined by the actions of the owner. While it is true that A.R.S. § 42–13302(A)(2) and (3) describe actions likely to be taken by the owner of property, such as a change in use or physical modification, not all triggering events enumerated in the statute flow from the owner's private conduct. Premiere's approach to the statute fails to account for the differences among the enumerated Rule B triggers, several of which are expressly or necessarily tied to the actions of the Assessor. For example, A.R.S. § 42–13302(A)(1) provides that Rule B shall apply when "land or improvements ... were erroneously totally omitted from the property tax rolls in the preceding tax year." Plainly, the omission of property from the tax rolls is a function of the Assessor's office—not an owner-driven act.

¶ 21 A.R.S. § 42–13302(A)(4), which specifically applies Rule B when a property is split, also applies Rule B to property that has been "subdivided or consolidated" between Janu-

---

3. A change in the *type* of owner may affect the classification of property or the applicability of various exemptions. Here, however, the only change is in the *identity* of the owner, and those considerations are not at issue in this case.

4. The distinction between the property's liability for tax and that of the owner is maintained in our current statutes. For purposes of property tax, A.R.S. § 42–16251(4) defines "taxpayer" as "the owner of real or personal *property that is* liable for tax." (Emphasis added.) By contrast, the Legislature has defined the term "taxpayer" by reference to *persons* in other parts of the code. For example, A.R.S. § 42–5001(18) defines "taxpayer" for purposes of the transaction privilege tax as "any person who is liable for any tax which is imposed by this article." And in the case of income tax, " 'taxpayer' means any person subject to a tax imposed by this chapter." A.R.S. § 43–1001(12) (2006).

ary 1 and September 30 of the valuation year. Subdivision of property, of course, cannot be accomplished without government approval. A.R.S. § 11–806.01(B) (2001) ("No plat of a subdivision of land within the area of jurisdiction of such county shall be accepted for recording or recorded until it has been approved by the board."). Because a purely private transaction cannot effect a subdivision, it would be difficult to argue that the effective date of a subdivision for tax purposes is any date other than that upon which the Assessor activates and values the new subdivided parcels.

¶ 22 Consolidation of property frequently involves an internal transaction with only one party—the common owner of multiple pieces of property. When a single owner of property decides to combine multiple properties into a single unit, no event of tax significance takes place until the Assessor has activated and valued the new, larger parcel. Similarly, when a landowner buys adjacent properties from third parties, nothing in Arizona law provides that the mere common ownership of adjoining properties constitutes "consolidation." A landowner who acquires adjoining parcels may elect to retain separate taxation for each of the parcels (and not trigger a Rule B valuation) or request that the parcels be formally consolidated into a single, larger parcel and valued accordingly. Because the consolidation process is not self-executing, the only rational interpretation of the statute is that a consolidation occurs when the Assessor completes the activation and evaluation of the new parcel.

¶ 23 We infer that by including the term "split" in the same sentence as "subdivision" and "consolidation," the Legislature intended that the three transformative events be treated in like manner. Faced with the choice between a rule that would value subdivisions, consolidations and splits upon formal action by the Assessor and one that would tie the timing of such events to the unique features of each land transaction, we believe that the former rule provides more certainty

and is more in keeping with the Legislature's intent.

¶ 24 If the rule were otherwise, there would be nothing to prevent owners from performing, but not recording, internal transactions to effect "splits" and "consolidations" without informing the Assessor. Depending on market conditions, such property owners could elect their own timing of Rule B treatment merely by informing the Assessor of the split at the moment of their choosing, or by undoing the split without ever informing the Assessor that the internal transaction had occurred. We discern nothing in the statutes to suggest that the Legislature intended to facilitate such a result.

#### 4. Arizona Law Contemplates Multiple Owners of Single Parcels.

¶ 25 A.R.S. § 42–18057 provides:[5]

A. If a parcel of real property is assessed in its entirety to one or more persons *and part of the property belongs to another person who does not appear on the assessment roll:*

1. That person may pay a portion of the whole tax in proportion to the person's interest in the property.

2. The county treasurer shall receive the tax and give a receipt to the person, subject to § 42–18055, subsection C, showing what part of the tax was paid.

B. A person who pays the tax on the whole parcel of which the person is a part owner has a lien on the share of the other part owner for that portion of the tax that was paid, with interest. The person may enforce the lien in the same manner as any other lien.

(Emphasis added.) Because Arizona law expressly addresses the shared responsibility for payment of taxes on jointly owned parcels, it appears that the Legislature did not intend a mere change in ownership of part of the parcel to constitute a split. Instead, when part of a parcel is sold, the original owner and the new owner effectively share ownership of a single "parcel" though they

---

5. After the period at issue in this case, the statute was amended to address allocations of tax on property splits after September 30 of the valua-tion year. These amendments do not affect our analysis.

own different property. Because neither is personally liable for the tax, each has an incentive to ensure that the tax on the existing parcel is paid to the extent of their respective ownership interests. If an owner pays an incorrect proportion of the tax, the statute provides a means to ensure that each owner is required to satisfy only its equitable share of the total tax liability for the parcel. Because the Legislature has clearly anticipated the possibility that a single parcel will be owned by more than one owner (and that some owners may be unknown to the Assessor), it appears to us that a private transaction transferring ownership of part of a parcel does not constitute a "split" for purposes of valuation.

### 5. The Error Correction Statutes Do Not Create A Blanket Exemption to the September 30 Deadline.

¶ 26 Premiere argues that the error correction statutes, A.R.S. §§ 42–16251 and –16252, permit the Assessor to "correct" the valuation of parcels when valuation is not completed by September 30 of the valuation year. A.R.S. § 42–16251(3)(e)(iii) provides that a correctable error includes:

> A failure to timely capture on the tax roll a change in value caused by new construction, the destruction or demolition of improvements, the splitting of one parcel of real property into two or more new parcels or the consolidating of two or more parcels of real property into one new parcel existing on the valuation date.

We conclude that this provision does not enable the Assessor to apply Rule B when new split parcels are activated after September 30 of the valuation year. First, the fact that a transaction that precipitates a split occurs too late to permit the Assessor to complete valuation of the new parcels by September 30 is not a "failure" on the Assessor's part. Second, as it concerns splits, the

statute is drafted with respect to "parcels," not "property." By its choice of language, the Legislature indicated its intent to tie splits to the administrative acts of the Assessor in activating and valuing parcels. Only when the valuation process is complete by September 30 of the valuation year and the resulting data is mistakenly omitted from the tax roll is a correction appropriate under this statute.

¶ 27 To suggest that the statute was intended to sweep post-September 30 splits into the current valuation year is to assume, not prove, that a "split" is effective as of the date of sale. We do not believe that the Legislature intended to create a system whereby the September 30 deadline could be disregarded every time it is not met, and we reject Premiere's argument to that effect.

### ATTORNEYS' FEES AND COSTS

¶ 28 Because we reverse the judgment in favor of Premiere, we likewise vacate the tax court's award of fees and costs.

### CONCLUSION

¶ 29 We hold that a split occurs when the Assessor completes the process of identifying and valuing the new parcels resulting from the split in the tax roll. We, therefore, reverse the judgment of the tax court and remand for entry of judgment in the County's favor.

CONCURRING: PATRICK IRVINE, Judge and DIANE M. JOHNSEN, Judge.